IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01670

TRAVIS MULLENIX

     Plaintiffs,

v.

DEMIAN LAPLANTE, an individual

     Defendant.

---

### PLAINTIFFS FIRST AMENDED COMPLAINT FOR PERSONAL INJURIES

---

     Plaintiff Travis Mullenix ("Mr. Mullenix") sustained severe damages as a result of Defendant Demian LaPlante's ("Defendant") continuous physical, sexual and psychological abuse commonly known as intimate partner violence. As a result, Mr. Mullenix submits the following Complaint.

#### PARTIES

1. Mr. Mullenix is a resident of and domiciled in Eagle County, Colorado. His address is 555 Gold Rivers Court, Basalt, CO, 81621

2. Upon information and belief, Defendant is a resident of and domiciled in Travis County, Texas.

#### JURISDICTION AND VENUE

3. This Court has jurisdiction over this action pursuant to C.R.S. § 13-1-124(I)(b) because Defendant committed tortious acts in Pitkin County, Colorado.

4. Venue is proper in this Court pursuant to C.R.C.P. 98(c)(5) because Defendant committed tortious acts in Pitkin County, Colorado.

#### GENERAL ALLEGATIONS

5. Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

6. Mr. Mullenix and Defendant met in 2011.

7.  Mr. Mullenix and Defendant started their same-sex romantic relationship in the early Summer of 2017 in New York City, New York.

8.  Defendant is 47-years-old. He is 16 years older than Mr. Mullenix.

9.  Mr. Mullenix is an independent artist who paints and produces fine art pieces.

10. Upon information and belief, Defendant is the grandson of C.E. Doolin, the co-founder of Frito Lays.

11. Defendant does not work and lives off-of a family trust.

12. Throughout Mr. Mullenix and Defendant's relationship, Defendant paid for Mr. Mullenix's personal expenses, his housing, his travel, and his other miscellaneous expenses.

13. Soon after Mr. Mullenix and Defendant's relationship began, Defendant propositioned that Mr. Mullenix host an art show out of Defendant's art gallery, at 525 East 27th St. New York City, New York.

14. During this time, Defendant asked Mr. Mullenix to live in one of his New York Residences, an apartment above the art Gallery, where Mr. Mullenix's art was being displayed.

15. About three months after Mr. Mullenix moved into Defendant's art gallery apartment, Defendant propositioned Mr. Mullenix to move into Defendant's primary residence at 5 Center Market Pl. New York City, New York.

16. Defendant became increasingly possessive of Mr. Mullenix in 2017.

17. Defendant canceled a trip to Italy in the summer of 2017 to spend more time with Mr. Mullenix.

18. In retrospect, Mr. Mullenix believes Defendant canceled his international trip in 2017 because Defendant was jealous and wanted to survey Mr. Mullenix.

19. Around Christmas, 2017, Mr. Mullenix went with Defendant to Austin, Texas, to visit Defendant's family.

20. Mr. Mullenix had dental issues upon arrival, leading him to get a root canal and stay with Defendant's brother through January 16th, 2018.

21. During this visit, Defendant started to display aggressive and alarming behavior.

22. On this incident, Defendant slapped Mr. Mullenix, leaving Mr. Mullenix in fear for his safety.

23. Defendant began a pattern where he would get intoxicated, verbally berate Mr. Mullenix, and subject Mr. Mullenix to physical domestic violence.

24. On April 11th, 2018, Defendant was being evicted from the art studio at 525 East 27th St. New York City, New York, for mishandling the lease and failure to pay rent.

25. Since he was being evicted, Defendant pressured Mr. Mullenix to move several 100 pieces of artwork into Defendant's home at 5 Center Market Pl. New York City, New York.

26. After Defendant took possession of Mr. Mullenix's artwork collection, Defendant changed his behavior and started to become controlling and violent with Mr. Mullenix.

27. During 2018, Defendant continually drank to the point of intoxication, verbally abused, and screamed at Mr. Mullenix, and subjected Mr. Mullenix to violence on numerous occasions.

28. In December 2018, Mr. Mullenix went back to Austin, Texas, to visit Defendant's family.

29. During this family visit, Mr. Mullenix was approached by Defendant's first cousin. Defendant's cousin brandished a firearm at Travis and stated something to the effect of, "This is private property, this is Texas, I could shoot you and nothing would happen."

30. During this threat, the cousin implied that Defendant's family had so much wealth that they were immune from consequences.

31. On Christmas Eve, 2018, Defendant and Mr. Mullenix stayed separate from Defendant's family in a hotel.

32. During this hotel stay, Defendant became intoxicated and started screaming at Mr. Mullenix for talking to other people at a gay bar.

33. After screaming at Mr. Mullenix, Defendant struck Mr. Mullenix and left the hotel.

34. Defendant left Mr. Mullenix at the hotel without money or a means of transportation.

35. Using physical violence against Mr. Mullenix and stranding Mr. Mullenix away from his residence became a pattern of behavior for Defendant.

36. In March of 2019, Mr. Mullenix and Defendant went to stay with Mr. Mullenix's friend Colleen Baum in Malibu.

37. During this time, Defendant repeatedly discouraged Mr. Mullenix from working, stating that he was jealous when Mr. Mullenix would go places without him and that Defendant would provide for him. On numerous occasions, Defendant stated that he wanted to start a fashion company where Mr. Mullenix would be the sole designer, and Defendant would finance everything.

38. On February 19th, 2019, Mr. Mullenix and Defendant met a jewelry business owner, Renee Tasic, at Nobu Malibu to discuss Mr. Mullenix's work as a designer for her website WintonOpals.com.

39. During this meeting, Defendant got heavily intoxicated. After becoming drunk, Defendant started to threaten violence against Mr. Mullenix.

40. Upon leaving the restaurant, Defendant took Mr. Mullenix's handbag, wandered about a half-mile away from the restaurant down the Pacific Coast Highway 1, and tried to throw the handbag in the Pacific Ocean.

41. Defendant screamed at Mr. Mullenix for approximately 45 minutes to an hour after leaving the restaurant.

42. Eventually, Defendant got into an Uber without Mr. Mullenix with the intent to strand him on the side of the highway. Mr. Mullenix had no money or means of transportation.

43. Ultimately, Mr. Mullenix contacted Ms. Tasic.

44. After relaying what happened, Ms. Tasic traveled to pick up Mr. Mullenix.

45. Concerned for Mr. Mullenix's safety, Ms. Tasic allowed Mr. Mullenix to sleep at her home for the evening.

46. That evening, Defendant called Mr. Mullenix's phone approximately 40 times. Defendant's messages were threatening and angry. At one point, Defendant begged Mr. Mullenix to come back to him, and in another correspondence, Defendant threatened to leave Mr. Mullenix if he didn't come back to him.

47. Upon information and belief, Defendant slept at his father's home in Malibu.

48. After confirming that Defendant had sobered up and calmed down, Mr. Mullenix met with Defendant the next day and Defendant apologized.

49. On February 29th, 2019, Mr. Mullenix went to a party with a high school friend Dora Hiller ("Ms. Hiller").

50. Ms. Hiller asked Mr. Mullenix that Defendant not come to the party because she witnessed Defendant's abusive behavior on numerous instances.

51. When Mr. Mullenix told Defendant that he didn't want him to join, Defendant threatened to end their relationship if Defendant couldn't come to the party.

52. Mr. Mullenix relented and allowed Defendant to come.

53. At the party, Defendant continued his pattern of abuse. Defendant became intoxicated, publicly berated Mr. Mullenix, and started publicly attacking him.

54. On or around March 1st, 2019, Mr. Mullenix fell asleep on the couch at a friend's house watching a movie. Mr. Mullenix woke up to Defendant screaming, "Why would you sleep on the couch when you're only allowed to sleep with me!"

55. After being screamed at, Mr. Mullenix retreated to the friend's downstairs bedroom. Defendant followed Mr. Mullenix and shoved him to the floor, and screamed at him.

56. Defendant continued to yell at and assault Mr. Mullenix the next day. Defendant continuously screamed out that Mr. Mullenix was not allowed to sleep anywhere except in bed with him.

57. During the summer of 2019, there were numerous instances where Defendant would become intoxicated and verbally abuse Mr. Mullenix.

58. Around the same time, Defendant started to tell friends that Mr. Mullenix was his "husband."

59. On August 19th, 2019, Defendant was intoxicated at his friend's birthday party in Brooklyn. While intoxicated, Defendant started screaming at Mr. Mullenix and shoving him.

60. After leaving the party with Mr. Mullenix, Defendant kicked him out of their Uber home and left Mr. Mullenix with no money and no transportation to get home.

61. Mr. Mullenix walked about four hours back to Defendant's home.

62. Around September 2019, Defendant proposed to Mr. Mullenix that they should create a fashion line.

63. Defendant promised that he would pay Mr. Mullenix $3,300 a month so that Mr. Mullenix would not have to work and could design a fashion line.

64. Upon Mr. Mullenix's request, Defendant also bought the website domains, TravisMullenix.com, Travismullenixart.com, TravisMLLNX.com, MLLNX.com, and Nichi-Futsu.com.

65. Defendant and Mr. Mullenix intended to use the domains to sell the fashion products that Mr. Mullenix was designing.

66. Upon information and belief, Defendant still retains the domains listed.

67. Defendant's intoxication and constant verbal, psychological, and physical abuse continued into 2020.

68. In February 2020, Defendant traveled with Mr. Mullenix to Tuscon, Arizona.

69. Mr. Mullenix spoke with friend and business contact Hannah Coleman about the possible purchase of crystals for a new fashion and jewelry line, and Defendant became jealous.

70. After meeting with Ms. Coleman at the Ace Hotel, Defendant became enraged with Mr. Mullenix.

71. Defendant again left Mr. Mullenix far away from their residence with no money or transport to get home.

72. In March 2020, Defendant tried to convince Mr. Mullenix to travel with him to Colorado to his family's 16 bedroom, 14.5 bathroom, 11,945 sq. ft., 600+ acre ranch named the "Peace Ranch."

73. The Peace Ranch is a remote ranch property 7.3 miles away from downtown Basalt up Frying Pan Rd.

74. While trying to persuade Mr. Mullenix to go to the Peace Ranch with him, Defendant stated that the ranch would give them a fresh start and would be a nice place to quarantine during the COVID-19 pandemic.

75. Defendant also urged Mr. Mullenix to forgo any type of regular employment in Colorado stating that Defendant would finance a fashion company, which included clothing, sunglasses, hats, and jewelry, that Mr. Mullenix would design.

76. Defendant verbally promised to both pay for materials and rent a commercial space boutique in Aspen.

77. Defendant again promised that he would pay Mr. Mullenix $3,300 for his work.

78. Mr. Mullenix agreed to go to the Peace Ranch. He did not have a car in Colorado and was utterly dependent on Defendant.

79. Once in Colorado, Defendant's abusive behavior escalated.

80. Defendant started to threaten Mr. Mullenix that he needed to do what Defendant wanted or that he would call the police and have him arrested on false charges.

81. On one of the first nights at the Peace Ranch in late March-early April 2020, Defendant became enraged with Mr. Mullenix.

82. During this incident, Defendant chased Mr. Mullenix around the Peace Ranch estate, pinned him to the floor, and screamed in Mr. Mullenix's face.

83. Mr. Mullenix was terrified. He realized that he was completely isolated at the Peace Ranch.

84. After berating Mr. Mullenix, Defendant locked Mr. Mullenix outside in freezing weather without a winter jacket.

85. The weather when Mr. Mullenix was locked out was below 32 degrees.

86. After the initial panic of being locked out set in, Mr. Mullenix realized how cold it was.

87. Mr. Mullenix thought that if he stayed outside long, he was going to die.

88. Mr. Mullenix attempted to open the windows and doors of his residence at the Peace Ranch in an attempt to escape the freezing weather. During this time, Defendant watched Mr. Mullenix and pointed and laughed at him.

89. After about 30 minutes of being outside in the icy cold, Defendant let Mr. Mullenix back inside.

90. Defendant continued this abusive behavior of berating Mr. Mullenix, locking him out of the ranch in the cold weather, and physically abusing him on numerous occasions.

91. On June 2nd, 2020, Defendant again berated Mr. Mullenix and chased him around.

92. During this attack, Mr. Mullenix locked himself in a small cabin on the back of the property because he feared for his safety.

93. On this date, to intimate Mr. Mullenix, Defendant called the Basalt Police at 5:35 pm to try to get Mr. Mullenix arrested on false charges.

94. Defendant then called the police back at 5:45 pm to tell them not to come to the Peace Ranch. In the call back to 911, the operator told Defendant that police would respond to the scene regardless. In response, Defendant stated there are numerous gates and codes to get through.

95. This is untrue, the Peace Ranch had one gate and one code.

96. Upon being asked for the gate codes, the Defendant refused to give the operator information about his location or how to get through the property's gates.

97. At the end of the call, the 911 operator summarized:

> "Operator - So you're at 2900 [Taylor Creek Rd., Basalt, CO 81621] and you're confirming you don't want anyone going?
> Defendant – I do not.
> Operator – Ok, and you won't give me the gate access codes or anything like that?
> Defendant – I uh, no I will not."

98. Police responded on scene, and Defendant refused to answer the door for police.

99. In June 2020, Mr. Mullenix and Defendant went to Heather Savory Pies Restaurant ("Heathers") in Basalt. Defendant proceeded to get drunk and berated Mr. Mullenix in front of the restaurant staff.

100. While screaming at Mr. Mullenix, Defendant continued a regular threat that he dangled in front of Mr. Mullenix, that he would kick Mr. Mullenix out of the Peace Ranch with no money and nowhere to go.

101. On this occasion, Defendant left Mr. Mullenix at Heathers with no money and no means of transportation.

102. Mr. Mullenix ended up having to sleep at one of the restaurant staff's apartments.

103. On July 24th, 2020, Mr. Mullenix went to Heathers without Defendant to see two friends who own a local Salon, The Art of Color.

104. Defendant drove to Heathers to try to get Mr. Mullenix to leave with him.

105. As Defendant came into Heathers, he appeared extremely drunk. Defendant was angry, slurring his words, unable to stand without the assistance of a wall or doorframe, and wreaked of alcohol.

106. Upon information and belief, on this date, Defendant did not have a valid driver's license.

107. After arriving at Heathers, Defendant screamed at Mr. Mullenix and berated him in front of restaurant staff and Mr. Mullenix's friends.

108. Mr. Mullenix left Heathers with the two friends.

109. Defendant followed Mr. Mullenix and his friends out to Midland Ave., at which point Defendant got back into his car.

110.    Mr. Mullenix fled down Midland Ave. to Two Rivers Rd.

111.    Defendant drove down and confronted Mr. Mullenix in front of Free Range Kitchen and Wine Bar ("Free Range").

112.    Free Range staff came outside and confronted Defendant, asking him to leave.

113.    Upon information and belief, Defendant left the scene and drove himself back to the Peace Ranch.

114.    Upon information and belief, Defendant crashed his car on that day in the driveway of the Peace Ranch.

115.    Mr. Mullenix's friends eventually drove him back to the Peace Ranch. Mr. Mullenix waited until he confirmed that Defendant was sober and calmed down.

116.    After this incident, Defendant's alcohol abuse continued to spiral out of control.

117.    On or around the week of August 3rd, 2020, Defendant continuously drank to intoxication and argued with his mother, Willadean Doolin, about going to inpatient alcohol rehabilitation.

118.    During this timeframe, Defendant became enraged with Mr. Mullenix, threatening to falsely call the police on Mr. Mullenix to have him arrested.

119.    While screaming at Mr. Mullenix, Defendant locked Mr. Mullenix out of the house.



Mr. Mullenix's injured face after being assaulted by Defendant on or around August 3, 2020. (Left)

120.    Mr. Mullenix found an open entryway into the house, and Defendant approached him, hitting Mr. Mullenix with closed fists.

121.    Mr. Mullenix suffered a split eyebrow from this attack and was knocked into the wall and onto the floor.

 

> Mr. Mullenix's texts with Heather's employee Jaqui Marx about the assault. (Above)

122.    After this attack, Defendant became very apologetic to Mr. Mullenix. As part of the apology, Defendant agreed to pay for Mr. Mullenix's psychotherapy treatment with an EMDR/PTSD specialist because he had to exhibit symptoms of P.T.S.D. from the relationship abuse.

123.    Mr. Mullenix suffered severe anxiety daily while living at Peace Ranch.

124.    Mr. Mullenix asked Defendant several times to purchase him a ticket to fly back to New York because Mr. Mullenix had no money.

125.    Defendant refused to let Mr. Mullenix leave.

126.    Defendant was eventually kicked out of the Peace Ranch by his mother, Ms. Doolin, because he refused to go to inpatient rehab.

127.    Upon information and belief, Defendant was also at this time removed from his family trust.

128.    To get back into the family trust, his family required Defendant to get a job.

129.    To fulfill this requirement, Defendant formally created a jewelry and fashion company with Mr. Mullenix. The business was named Nichi Futsu.

130.    Defendant and Mr. Mullenix agreed that Mr. Mullenix would design the jewelry, clothing, and sunglasses for the business, and Defendant would supply funds to purchase items for the business.

131.    Defendant retained Gretta Mckenney to draft a business budget, establish an L.L.C., and create an operating agreement that would make Mr. Mullenix a 50% owner in the business. Mr. Mullenix discussed with Defendant that he would receive 50% of all profits.

132.    Ms. Mckenney created a business budget and business plan to provide back to the trust.

133.    Upon information and belief, Defendant was allotted $72,000 from the trust to fund the business, and his monthly allowance was increased to $26,000.

134.    On numerous occasions through the fall of 2020, Defendant agreed to give Mr. Mullenix a stipend of $3,300 a month for his work in the business.

135.    Defendant relayed that he wanted to pay Mr. Mullenix $3,300 a month to Ms. Mckenney, and that was put into the business budget.

136.    Mr. Mullenix started working right away, yet Defendant never provided Mr. Mullenix his payment.

137.    After regaining access to his family's trust, Defendant and Mr. Mullenix moved into an Aspen West End Townhome at 814 Bleaker St. Aspen, CO Unit C4.  While Defendant paid for both parties, both Mr. Mullenix and Defendant were on the lease.

138.    On the first night at the Aspen West End Townhome, Defendant became mad at Mr. Mullenix for sleeping on the couch when Defendant wanted Mr. Mullenix in bed with him.

139.    After Mr. Mullenix relented, Defendant woke Mr. Mullenix by screaming directly into his face.

140.    Mr. Mullenix fled to a second bedroom in the home and closed the door. There was no lock on the door, so Mr. Mullenix could not safely separate himself from Defendant.

141.    Defendant continued to scream at Mr. Mullenix through the door.

142.     Like a scene out of "The Shining," Defendant punched a hole in the door to the second bedroom trying to get to Mr. Mullenix.

143.     Defendant continued screaming that he wanted Mr. Mullenix to come to bed with him.

144.     Seeing no way out, Mr. Mullenix complied. He opened the door and followed Defendant back to the other bedroom.

145.     Over the next month, Defendant continually verbally abused Mr. Mullenix.

146.     About a month later, on December 13th, 2020, Mr. Mullenix and Defendant went to the Aspen Eagles Club.

147.     A stranger from New York talked with Mr. Mullenix, and Defendant got extraordinarily jealous and angry at Mr. Mullenix.

148.     Afterward, Mr. Mullenix and Defendant went to Hickory House Ribs Restaurant ("Hickory House") in West Aspen about a block from their townhome.

149.     At Hickory House, Defendant became intoxicated and started screaming at Mr. Mullenix at the top of his lungs. He was calling Mr. Mullenix disparaging and vulgar names.

150.     Defendant also picked up bottles at Hickory House and motioned as if he was going to hit Mr. Mullenix and yelling, "I will fuck you up."

151.     The Hickory House general manager threatened to call the police, so Defendant and Mr. Mullenix left to go home.

152.     Later that evening, Defendant proceeded to break items in the apartment, throwing dishes, jewelry, trays, crystals, and other objects around the kitchen and living room. This caused a large amount of broken glass to be strewn across the residence's first floor.

153.     Defendant then threw a living room chair at an ottoman, breaking both pieces of furniture.

154.     Defendant dumped red wine all over the sofa in an attempt to ruin the sofa.



A still image from Aspen Police Officer Seth DelGrasso's Body Worn Camera Video. The camera is pointing through Defendant and Mr. Mullenix's glass front door to show items destroyed in the kitchen and living room. Of note, a three-quarters empty bottle of Whispering Angel red wine is left unbroken on the kitchen counter. (Left)

155.    Defendant then turned to Mr. Mullenix.

156.    Defendant grabbed Mr. Mullenix by his head and chest and slammed him down.

157.    Mr. Mullenix does not know if he hit his head on the kitchen countertop or wall, but Defendant slammed Mr. Mullenix's head down hard.

158.    Defendant did not stop or let up his attack. Once on the ground, Defendant grabbed Mr. Mullenix by his hair.

159.    Defendant dragged Mr. Mullenix by his hair across the ground covered in glass and ceramic shards from the items Defendant destroyed.

160.    Mr. Mullenix tried to run and getaway, but Defendant wouldn't allow him to leave.

161.    Mr. Mullenix thought Defendant wanted to inflict as much violence on him as possible or kill him.

162.    Mr. Mullenix continued to struggle, but was unable to leave.

163.    Defendant stomped on Mr. Mullenix's chest, legs, and feet.

164.    Mr. Mullenix thought he was going to die.

165.    In the course of this attack, Defendant broke one of Mr. Mullenix's ribs.

166.    Defendant's next-door neighbors called police that evening and videotaped the yelling, which you could hear through the walls.

167.    In the video recordings, you can hear Mr. Mullenix screaming, "STOP! STOP! STOP! YOU'RE HURTING ME!"

168.    Around this time, police were called, Mr. Mullenix was able to struggle and get free. Mr. Mullenix fled Defendant, fearing for his life. Mr. Mullenix left the townhome with no phone, no jacket, and no money.

169.    Aspen police responded to the scene.

170.    Aspen police officers spoke with Defendant, who was slurring his words and unable to stand without leaning against the door frame. Defendant appeared visibly intoxicated.

171.    When asked, "What happened here this evening?" Defendant slurred back, "Honestly, I don't even know. I don't even what happened. It just despicable at the end of the day. I, like, it's horrible."

172.    As police went to talk to neighbors and return to their car, Defendant closed the door on police.

173.    Upon returning to the home, Defendant refused to open his door.

174.    Upon information and belief, police did not make an initial arrest because Defendant denied his actions, and police could not discern what went on as Mr. Mullenix had left the apartment.

175.    Police discussed that they would come back the next day, but that this action constituted obstruction of justice.

176.    Mr. Mullenix returned to the townhome the next day. As he entered the unit, he witnessed all of the broken items on the kitchen and living room floor.

177.    Defendant at first apologized to Mr. Mullenix, but then the apology turned into another argument.

178.    Defendant threatened Mr. Mullenix that he was going to leave him. Defendant again started verbally attacking Mr. Mullenix.

179.    Mr. Mullenix, again fearing for his safety, left to call the police at Hickory House because he did not have a phone.

180.    Defendant followed Mr. Mullenix outside to deter him from calling the police.

181.    Mr. Mullenix, afraid of Defendant, returned to the townhome so that Defendant would not attack him.

182.    As the argument continued, Defendant again slapped Mr. Mullenix and threw him onto the floor of the second level of the townhome.

183.    After being thrown on the floor, Defendant pushed Mr. Mullenix down the stairs of the townhome.

184.    Mr. Mullenix grabbed back at Defendant, hit him, and screamed that he was going to call the police, prompting Defendant to leave the townhome.

185.    Mr. Mullenix followed Defendant outside.

186.    As the fight was happening again, the next-door neighbors called the police.

187.    Aspen Police officers came into contact with Defendant and Mr. Mullenix.

188.    Defendant was arrested on charges of Assault in the Third Degree, Criminal Mischief, and Obstructing Government Operations.

189.    In the course of their business, Mr. Mullenix and Defendant ordered over $67,000 worth of materials to design and produce fashion products with the understanding that Defendant would pay those bills.

190.    After Defendant's arrest, Defendant refused to pay for any previously ordered items for Mr. Mullenix and his fashion business, leaving Mr. Mullenix with the entire bill.

191.    Defendant and Mr. Mullenix still owe $31,608 to Angela Kim ("Ms. Kim") at The Atelier, L.L.C.

192.    Defendant and Mr. Mullenix still ower $24,675 to In Vogue Studios, L.T.D.

193.    Defendant and Mr. Mullenix still owe $1,200 to Susan Carrolan Millinery.

194.    Defendant personally represented to the sellers of materials that he, not Mr. Mullenix, would pay for the items.

195.    In addition, Defendant, through his personal representative, sent correspondence to all people with access to his apartment 5 Center Market Pl. New York City, NY 10013 that Mr. Mullenix is not to be able to access his personal items or over 100 paintings in the residence.

196.    Mr. Mullenix has sold several of the paintings in the apartment, but has been unable to access them because of Defendant's interference.

197.    As a result of the December 13th, 2020, Mr. Mullenix has suffered a broken rib and numerous superficial injuries.

198.    Mr. Mullenix suffered numerous other bruises and injuries as a result of Defendant's physical domestic violence.

199.    Mr. Mullenix is extremely emotionally damaged from Defendant's verbal, physical, and psychological abuse.

200.    Mr. Mullenix suffers from severe PTSD.

201.    Both during and after the relationship ended, Mr. Mullenix saw a couples and individual counsel.

202.    Defendant and Mr. Mullenix's couples counselor has stated that "In learning their story, it became clear to me this couple fell into the category of Domestic Violence, Demian being the batterer and Travis the victim."

203.    Defendant confessed his actions from December 13th, 2020 through December 14th, 2020 to this couple's counselor.

204.    In the couples counselor's report of that conversation, she writes, "[Regarding what] happened at the Hickory House. Demian's violence towards Travis was so severe, it could have had dire consequences resulting in brain damage or even death."

205.    Defendant also confessed his abuse and malicious conduct to mutual friends Ms. Hiller and Ms. Kim.


### FIRST CAUSE OF ACTION: EXTREME AND OUTRAGEOUS CONDUCT

206.    Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

207.    Conduct that constituted Extreme and Outrageous conduct includes:

a.  Physical abuse.
b.  Isolating Mr. Mullenix socially and physically.
c.  Calling the police on Mr. Mullenix to have him falsely arrested.
d.  Locking Mr. Mullenix out of the Peace Ranch during winter.

208.    Defendant did so recklessly and with the intent of causing Mr. Mullenix severe emotional distress and with the knowledge that it would cause Mr. Mullenix severe emotional distress.

209.    Defendant's conduct did in fact cause Mr. Mullenix severe emotional distress.

210.    As a direct and proximate result of the tortious actions of Defendant, Mr. Mullenix has incurred past and future economic expenses, losses, damages, including, but not limited to: past and future medical expenses, loss of earnings, and impairment of earning capacity.

211.    As a direct and proximate result of the tortious actions of Defendant, Mr. Mullenix incurred in the past, and will continue to incur into the future, non-economic damages including, but not limited to: loss of enjoyment of life, pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, and humiliation.

212.    As this extreme conduct happened while Defendant and Mr. Mullenix engaged in an intimate relationship, the attacks qualify as intimate partner violence.


## SECOND CAUSE OF ACTION: ASSAULT

213.    Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

214.    The Defendant's numerous verbal, psychological, and physical attacks of Mr. Mullenix from 2017 through 2020 intended to cause an offensive or harmful physical contact with the Plaintiff or intended to place the Plaintiff in apprehension of such contact.

215.    The Defendant placed the Mr. Mullenix in apprehension of immediate physical contact.

216.    That contact was harmful, causing Mr. Mullenix injuries, damages, and losses.

217.    At all times in question, Defendant and Mr. Mullenix were in an intimate relationship.

218.    The last assault of Mr. Mullenix by Defendant occurred in December 2020.

219.    Throughout the relationship, Mr. Mullenix was psychologically and emotionally unable to acknowledge the act of domestic violence and the resulting harm.

## THIRD CAUSE OF ACTION: BATTERY

220.    Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

221.    The Defendant's numerous physical attacks from 2017 through 2020 resulted in physical contact with the Mr. Mullenix.

222.    During these attacks, Defendant intended to make harmful or offensive physical contact with the Plaintiff.

223.    The contacts were harmful.

224.    At all times in question, Defendant and Mr. Mullenix were in an intimate relationship.

225.    The last assault of Mr. Mullenix by Defendant occurred in December 2020.

226.    Throughout the relationship, Mr. Mullenix was psychologically and emotionally unable to acknowledge the act of domestic violence and the resulting harm.

## FORTH CAUSE OF ACTION: INTENTIONAL INTERFERENCE WITH CONTRACTUAL OBLIGATIONS

227.    Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

228.    The Plaintiff had a contract to sell two paintings to Ms. Kim for $5,000 each.

229.    The paintings were located at Defendant's residence at 5 Central Market Pl. New York City, New York, 10013.

230.    The paintings were being sold to compensate Ms. Kim for her outstanding contracts.

231.    Ms. Kim attempted to retrieve the paintings, but was barred by Defendant.

232.    The Defendant knew or should have known about the contract.

233.    The Defendant, by words or conduct or both, intentionally barred Ms. Kim or anyone associated with Mr. Mullenix from accessing Mr. Mullenix's paintings.

234.    The Defendant's interference with the contract was improper; and

235.   The Defendant's interference caused Mr. Mullenix to not have access to 100 pieces of artwork valued at approximately $500,000 total. The Defendant's interference caused Mr. Mullenix to lose the sale of several paintings to Ms. Kim.

### FIFTH CAUSE OF ACTION: BREACH OF CONTRACT

1. Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

2. The Plaintiff and Defendant contracted with numerous fashion vendors, In Vogue Studios, Specialty Hates, and the Altier LLC in which the vendors agreed to provide materials for fashion in exchange for payment by Defendant.

3. The Defendant agreed to pay these vendors and Plaintiff was going to use the materials for a joint business venture.

4. Defendant failed to pay any vendors.

5. Plaintiff has maintained contact with the vendors and substantially performed his duties.

6. The vendors substantially performed their duties.

7. The Defendant's failure to uphold the contract caused Mr. Mullenix to suffer damages in the amount of $57,493.

### SIXTH CAUSE OF ACTION: BREACH OF CONTRACT

8. Mr. Mullenix adopts and incorporates by reference the allegations of the previous paragraphs as if fully set forth herein.

9. Defendant entered into a verbal contract with Mr. Mullenix to pay Mr. Mullenix $3,300 a month for his work starting on or around September 2019.

10. Defendant made numerous additional verbal commitments to Mr. Mullenix to pay him $3,300 a month.

11. These verbal commitments continued through the fall of 2020.

12. Defendant failed to pay Mr. Mullenix for any of his time from September 2019 through Defendant's arrest in December 2020.

13. The Plaintiff substantially performed his duties, as was expected under this contract.

14. The Defendant's failure to uphold the contract caused Mr. Mullenix to suffer lost wages in the amount of $49,500.

15. Mr. Mullenix also suffered future lost wages because of this.

WHEREFORE, Mr. Mullenix demands judgment as follows:

A. Award compensatory damages in an amount to be determined at trial in favor of Mr. Mullenix, and against Defendant, for past and future medical expenses, past and future pain and suffering, as well as emotional anxiety, disability, and embarrassment; past and future loss of normal life; past and future wage loss, emotional distress; permanent disability and injury; and

B. Costs, including expert witness fees, and Mr. Mullenix's reasonable attorney's fees, costs, and expenses;

C. Pre-judgment interest; and

D. Award such other and further relief to Mr. Mullenix and against Defendant.

#### MR. MULLENIX DEMANDS A TRIAL TO A JURY.

_____
Michael Fox
Kalamaya Goscha
133 Prospector Rd. Suite 4102x
Aspen, CO 81611
P: (970) 305-3794
Michael@kalamaya.law

**CERTIFICATE OF SERVICE (CM/ECF)**

I certify that on the 9th  day of July, 2021, I electronically filed the foregoing Plaintiff's First Amended Complaint for Personal Injuries with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following e-mail address:

Daniel Graham
Markus Funk
DGraham@perkinscoie.com
MFunk@perkinscoie.com
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303.291.2300
Facsimile: 303.291.2400


_____

Michael Fox